UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

AMELIA BROWN & WESLEY SUMPTER,

Plaintiffs,

-against-

CITY OF NEW YORK, DETECTIVE FERNANDO
SANCHEZ (Shield # 4010), SERGEANT ADAN MUÑOZ
(Shield #1313), UNDERCOVER OFFICER #CO 121,
POLICE OFFICERS JOHN DOE #1-10,

Defendants.

-------------------------------------------------------------------- x

**COMPLAINT AND
JURY DEMAND**

**Docket No.**

Plaintiffs Amelia Brown and Wesley Sumpter, by their attorney Amy Robinson, of Stoll,

Glickman & Bellina, LLP, for their Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which Plaintiffs seek relief through 42 U.S.C. § 1983 for

violations of their Fourth and Fourteenth Amendment rights, in addition to violations of the laws

and Constitution of the State of New York.

2.     The claim arises from an October 21, 2015 incident in which officers of the New York

City Police Department ("NYPD"), acting under color of state law, intentionally and willfully

subjected Plaintiffs to, among other things, false arrest and excessive force.

3.     Plaintiffs seek monetary damages (special, compensatory, and punitive) against

Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as

the Court deems just and proper.

## JURISDICTION & VENUE

4.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988 and the laws and Constitution of the State of New York.

5.     The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

6.     Venue is laid within the Eastern District of New York in that Defendant City of New York is located, and a substantial part of the events giving rise to the claim occurred, within the boundaries of the Eastern District.

## PARTIES

7.     Plaintiffs AMELIA BROWN and WESLEY SUMPTER resided at all times here relevant in Queens County, City and State of New York.

8.     The CITY OF NEW YORK ("CITY") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel.  In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

9.     DETECTIVE FERNANDO SANCHEZ was, at all times here relevant, a detective of the NYPD, and as such was acting in the capacity of an agent, servant, and employee of the City of New York.  On information and belief, at all times relevant hereto, Det. Sanchez was involved in the decision to arrest Plaintiff without probable cause or failed to intervene in the actions of

his fellow officers when he observed his fellow officers arresting Plaintiff without probable cause.

10.    SERGEANT ADAN MUÑOZ was, at all times here relevant, a sergeant of the NYPD, and as such was acting in the capacity of an agent, servant, and employee of the City of New York.  On information and belief, at all times relevant hereto, Sgt. Muñoz was involved in the decision to arrest Plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed his fellow officers arresting Plaintiff without probable cause.

11.    UNDERCOVER OFFICER #CO 121 ("UC 121") was, at all times here relevant, an undercover officer of the NYPD, and as such was acting in the capacity of an agent, servant, and employee of the City of New York.  On information and belief, at all times relevant hereto, UC 121 was involved in the decision to arrest Plaintiff without probable cause or failed to intervene in the actions of his fellow officers when he observed his fellow officers arresting Plaintiff without probable cause.

12.    POLICE OFFICERS JOHN DOE #1-10, whose identities are currently unknown to Plaintiffs, were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agents, servants and employees of the City of New York.  On information and belief, at all times relevant hereto, the John Doe officers were involved in the decision to arrest Plaintiffs without probable cause or failed to intervene in the actions of their fellow officers when they observed them arresting Plaintiffs without probable cause.  Defendant officers are sued in their individual capacities.

13.    At all times here mentioned Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## NOTICE OF CLAIM

14.    Within 90 days of the events giving rise to this claim, Plaintiffs filed written Notices of Claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filing of the Notices, and this matter has not been settled or otherwise disposed of.

## FACTUAL ALLEGATIONS

15.    On October 21, 2015, at approximately 6:45 P.M., Plaintiffs Amelia Brown and Wesley Sumpter were at their home in Queens, NY.

16.    Also home were Plaintiffs' young children, who were 8 years old and 11 months old. Ms. Brown was pregnant at the time and her 11 month-old daughter had recently come home from the hospital, having been diagnosed with sickle-cell anemia.

17.    Mr. Sumpter went outside the house to smoke a cigarette.

18.    Suddenly, Mr. Sumpter saw several men running toward him.  Scared, Plaintiff quickly went back inside the house and closed the door behind him.

19.    Plaintiff later learned that the men were plainclothes NYPD officers, the named defendants in this action.

20.    A few moments later, Defendants Det. Sanchez, Sgt. Muñoz, UC 121, and the John Doe Officers loudly banged on Plaintiffs' door and forcibly entered Plaintiffs' home, damaging the front door as they entered.

21.    Plaintiffs were not committing any crimes, had not committed any crimes, and did not consent to the warrantless entry.

22.    Once inside, the officer defendants asked Plaintiffs for their identifications, which Plaintiffs provided.  The officers indicated that Plaintiffs were free to leave, and that they would call someone to fix the front door.

23.     Plaintiffs, believing the incident was over, walked inside their apartment to take care of their children.

24.     A few moments later, the John Doe officers entered Plaintiffs' apartment, unannounced, uninvited, and without a warrant, and arrested Plaintiffs without probable cause to believe any crime had been committed.

25.     While the officers were arresting Mr. Sumpter, they forcibly grabbed him, threw him to the ground, and threated him with a Taser.

26.     As they were arresting Ms. Brown, the officers grabbed her 11 month-old daughter out of her arms.  She pled with them to stop, and explained that her daughter had just been released from the hospital.  The officers ignored Ms. Brown's pleas and slammed her against a wall while arresting her.

27.     The officers escorted Plaintiffs to a police van, where they remained for hours.

28.     The officers then conducted a warrantless search of the claimants' home without legal basis to do so.  In the process of conducting the search, the officers damaged Plaintiffs' personal property and belongings.

29.     Plaintiffs were taken to the 105th Precinct and then to Central Booking.

30.     Defendant officers misrepresented to the Queens County District Attorney's Office that Mr. Sumpter had committed the offenses of Obstructing Governmental Administration, Resisting Arrest, and Disorderly Conduct, and that Ms. Brown had committed the offenses of Obstructing Governmental Administration and Disorderly Conduct.

31.     On October 22, 2015, Plaintiffs were arraigned in Queens Criminal Court and released on their own recognizance.

32.     Plaintiffs returned to Queens Criminal Court on December 17, 2015.  All charges have

been dismissed and sealed.

33.     At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate Plaintiffs' rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers against Plaintiffs.

34.     During all of the events above described, Defendants acted maliciously and with intent to injure Plaintiffs.

## **DAMAGES**

35.     As a direct and proximate result of the acts of Defendants, Plaintiffs suffered the following injuries and damages:

    a.  Violation of their rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their persons;

    b.  Violation of their rights pursuant to the Fourteenth Amendment of the United States Constitution to due process;

    c.  Violation of their New York State Constitutional rights under Article 1, Section 12 to be free from an unreasonable search and seizure;

    d.  Violation of their New York State Constitutional rights under Article 1, Section 6 to due process;

    e.  Physical pain and suffering;

    f.  Destruction of property;

    g.  Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety; and

    h.  Loss of liberty.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983

36. The above paragraphs are here incorporated by reference.

37. Defendants acted with malicious intent and/or deliberate indifference in stopping and searching Plaintiffs without legal justification.

38. The officer defendants wrongfully and illegally arrested, detained, and imprisoned Plaintiffs, and used excessive force against them.

39. The wrongful, unjustifiable, and unlawful apprehension, arrest, detention, and imprisonment of Plaintiffs was carried out without a valid warrant, without Plaintiffs' consent, and without probable cause or reasonable suspicion.

40. At all relevant times, Defendants acted forcibly in apprehending, arresting, and imprisoning Plaintiffs.

41. All of this occurred without any illegal conduct by Plaintiffs.

42. Plaintiffs' cases have been dismissed and sealed.

43. By unlawfully seizing Plaintiffs, falsely arresting Plaintiffs, using excessive force against Plaintiffs, fabricating false information about Plaintiffs to the Queens District Attorney's Office, and failing to intervene on behalf of one another's unlawful and unconstitutional conduct, Defendants deprived Plaintiffs of their rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. §1983, including, but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

44. Defendants acted under color of law and conspired to deprive Plaintiffs of their civil, constitutional, and statutory rights to be free from unreasonable search and seizure and to due process of law.

45.    Plaintiffs have been damaged as a result of Defendants' wrongful acts.

## SECOND CAUSE OF ACTION
42 U.S.C. § 1983
MUNICIPAL LIABILITY

46.    The above paragraphs are here incorporated by reference.

47.    The City is liable for the damages suffered by Plaintiffs because, after learning of its employees' violations of New Yorkers' constitutional rights, the City has:  failed to remedy the wrong; created policies or customs under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful events.  The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct. By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

48.    The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize New Yorkers without probable cause, bring charges against New Yorkers with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

49.    Despite having acquired such knowledge, the City has refused to appropriately sanction its employees' illegal behavior.

50.    The City's deliberate indifference to civil rights violations committed by individual

police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct has caused the constitutional violations against Plaintiffs in this case.

## THE CITY FAILS TO TRACK CIVIL RIGHTS LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE

51.    For decades, the City has been on notice that certain officers and precincts are disproportionately responsibility for civil rights lawsuit liability.  Nonetheless, the City has failed to take action to hold officers or precincts accountable.

52.    In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even substantial ones – and NYPD discipline of officers.[1]  Hevesi continued:

> As a result, the NYPD does not learn of potential problem officers, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation, resulting in harm to another person and further damages from the City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[2]

53.    The Comptroller recommended that the police department "analyze . . . settled claims, and take steps to review the officers' performance and propensity to commit acts of excessive force."[3]

54.    The City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today.   The number of claims against the NYPD has doubled in recent years, costing

---

[1] *Id*.

[2] *Id*.

[3] *Id*.

taxpayers more than $1 billion.[4]

55.    Yet the City continues to resist attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD.  Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data, or even to use the data it already has.[5]

56.    Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct.  *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v. Piphus,* 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001)

---

[4] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD); Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014, http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

[5] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases.  A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

57.  However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court.

58.  Civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily not even noted in an officer's personnel file.[6]

59.  By failing to keep track of crucial data – which could save lives as well as taxpayer money – the City has created a system in which lawsuits are severed from any potential deterrent effect.

## THE CITY FAILS TO DISCIPLINE OFFICERS WHO COMMIT PERJURY AND FALSIFY OFFICIAL RECORDS

60.  The City is liable to Plaintiffs for its failure to keep track of judicial decisions in suppression hearings where police officers have been found to have fabricated testimony.

61.  There are hundreds of published decisions from the past several years in which judges in New York City courtrooms determine that, as a matter of law, police officers have testified incredibly, conducted illegal searches and seizures, and even suborned perjury.

62.  Judicial decisions from suppression hearings and trials are particularly reliable indicators of a police officer's professional conduct and credibility because the testimony has been tested in open court, under oath.

63.  Yet those in a position of authority – such as NYPD supervisors and prosecutors – have no procedure to notify individual officers or their supervisors of adverse judicial findings.

---

[6] Association of the Bar of the City of New York, Committee on New York City Affairs, "The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change,"  March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.

64.   Without any notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.

65.   This has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal.  As the Honorable Jack Weinstein, United States District Court Judge of the Eastern District of New York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

**THE CITY FAILS TO HOLD POLICE OFFICERS PERSONALLY FINANCIALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY**

66.   The City of New York is also liable in this case because, by habitually indemnifying police officers who have acted unconstitutionally, the City isolates such officers from accountability.[7]   The effect – yet again – is that civil rights lawsuits do not serve a deterrent purpose.   "It is almost axiomatic that the threat of damages has a deterrent effect, *surely particularly so when the individual official faces personal financial liability*." *Carlson v. Green*,

---

[7] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014, http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against police officers).

446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

## THE CITY HAS FAILED TO CREATE A MEANINGFUL POLICE OVERSIGHT AGENCY, THUS ALLOWING OFFICERS' UNLAWFUL BEHAVIOR TO GO UNCHECKED

67.    The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished.

68.    The City has purported to attempt to address police officers' abuse of authority, in part through the creation of the CCRB, a police oversight agency with investigative powers.

69.    However, the CCRB has proved vastly inadequate.

70.    First, the CCRB fails in its mission because it often has found that complainants "lack credibility" based on the fact that the complainant has also brought a civil rights lawsuit.  The result is that the CCRB often fails to substantiate some of the most serious allegations.

71.    Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those dishonest officers.  The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

72.    Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its officers.  Even when the CCRB substantiates complaints, the police department rarely imparts its own discipline on the officer, and often simply drops the complaints.[8]

---

[8] *See* Nathan Tempey, *CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force*, gothamist, July 28, 2015, http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 10 2 officers in that same period.  Of the officers disciplined, only 22 faced administrative charges); WNYC.org, *Police Punishment: CCRB vs NYPD*, http://project.wnyc.org/ccrb/ (last visited July 23, 2015) (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

73.     Fourth, the NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized.  Furthermore, in the rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner has wielded.

74.     The complaint procedure provides seemingly countless opportunities for City agencies to dismiss or disregard legitimate, credible complaints.

75.     Due to the failures of the CCRB, many abuses of authority by police officers go unreported.  Officers are thus free to abuse their authority with little or no fear of repercussions.

76.     Here, the lack of accountability contributed to the defendant police officers' actions described above in that the officer defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiffs.

77.     Upon information and belief, sine 2005, Defendant Sgt. Muñoz has faced more than 30 charges filed with the CCRB against him.  Although Sgt. Muñoz has been placed on modified duty at least twice, there has been no true accountability for his actions, and his behavior has gone unchecked.

**THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS THROUGH ITS USE OF ARREST QUOTAS**

78.     The City has also been alerted to the regular use of "Stop, Question, and Frisk" by its police officers, which disproportionately target people of color, despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

79.     Even as the use of "Stop, Question, and Frisk" has declined precipitously in recent

years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

80.   According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times.  Of the people stopped:  38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[9]

81.   The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people.  For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[10]   The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not recall ever having arraigned a white defendant on an open container charge.[11]

82.   Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of innocent New Yorker's civil rights.[12]

83.   The City's inability to prevent its officers from abusing the stop and frisk policy is

---

[9] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

[10] See NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.
[11] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

[12] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority.  Such failures have led to further abuse of authority by police officers, including the incident underlying Plaintiffs' Complaint.

**DEFENDANT OFFICER'S PRIOR LAWSUIT & CCRB HISTORY**

84.   The City of New York knew or should have known of the defendant officers' propensity to engage in misconduct of the type alleged in this Complaint, specifically arresting New Yorkers without probable cause to believe they have committed a crime or engaged in any wrongdoing, and using excessive force against New Yorkers.

85.   Specifically, the City of New York has been aware of *numerous* claims of constitutional violations involving Defendant Sgt. Adan Muñoz, as documented in the following civil rights actions filed against the City of New York and Officer Muñoz in Federal court:

   a.   *Bell, et al. v. City of New York, et al.*, 14-CV-4585 (ENV) (CLP) (alleging, in part, excessive force against multiple plaintiffs; case settled);

   b.   *Dunn v. City of New York, et al.*, 14-CV-5911 (FB) (VMS) (alleging that Sgt. Muñoz conducted an unlawful search and seizure; case settled);

   c.   *Rodriguez v. City of New York, et al.*, 15-CV-793 (RRM) (RML) (alleging unlawful search and seizure, threats of violence, and false arrest; case pending);

   d.   *Giles, et al., v. Spataro, et al.*, 15-CV-893 (ENV) (LB) (alleging that Sgt. Muñoz subjected multiple plaintiffs to excessive force, unlawful entries into their residences, false arrest, and denial of a fair trial; case pending);

   e.   *Whitney v. City of New York, et al.*, 15-CV-5176 (AMD) (VMS) (alleging false arrest, excessive force, denial of a fair trial, malicious prosecution, and unlawful search; case settled);

   f.   *Cayemittes v. City of New York, et al.*, 15-CV-2364 (WFK) (RLM) (alleging that Sgt. Muñoz subjected the plaintiff to false arrest and imprisonment, excessive force, and deprivation of his right to a fair trial; case pending);

   g.   *Damas v. City of New York, et al.*, 16-CV-1690 (NGG) (VMS) (alleging

that, in May 2015, just 5 months before the allegations in this Complaint, Sgt. Muñoz subjected the plaintiff to an unlawful search and seizure, false arrest, and assault and battery; case pending);

86.   The City of New York has also been aware of claims of constitutional violations involving Defendant Sgt. Adan Muñoz, as documented in the following civil rights action filed against the City of New York and Officer Muñoz and New York State court:

a.   *Berry v. City of New York, et al.*, Index No. 00728/2015 (alleging that Sgt. Muñoz subjected the plaintiff to racial epithets, directed another officer to assault the plaintiff, and then battered the plaintiff).

87.   Additionally, the City of New York has been aware that Sgt. Muñoz has a long history of complaints since he joined the NYPD in 2004.  Upon information and belief, there have been more than 30 charges filed with the CCRB against Sgt. Muñoz since 2005.  This does not include charges filed and investigated by the Internal Affairs Bureau.

88.   Upon information and belief, Sgt. Muñoz has been placed on modified duty on at least two occasions during his career as an officer of the NYPD.

89.   Despite Sgt. Muñoz repeated acts of violence and his flagrant disregard for the constitutional rights of New Yorkers, the City failed to impose any meaningful sanctions or punishment on Defendants as a result of these prior lawsuits, CCRB complaint, and investigations.  Despite its knowledge of Sgt. Muñoz's behavior, the City has continued to employ him and even promoted him to the rank of Sergeant in 2009.

90.   This demonstrates the total lack of accountability and instills a belief in Defendants that there are no consequences for violating the civil rights of the people they are supposed to protect.  That belief contributed to Defendant's conduct towards Plaintiffs in the instant case.

91.   The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.  Despite such notice, the City has failed to take corrective action.  This

failure and these policies caused the officers in the present case to violate Plaintiffs' civil rights, without fear of reprisal.

92.     Plaintiffs have been damaged as a result of the City's deliberate indifference.

### THIRD CAUSE OF ACTION
FALSE ARREST & ILLEGAL IMPRISONMENT

93.     The above paragraphs are here incorporated by reference.

94.     Defendants subjected Plaintiffs to false arrest, false imprisonment, and deprivation of liberty without probable cause.

95.     Defendants intended to confine Plaintiffs, Plaintiffs were conscious of their confinement, and did not consent to their confinement.

96.     Defendants, their officers, agents, servants and employees, were responsible for Plaintiffs' arrest, detention and imprisonment during this period of time.

97.     As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiffs sustained the damages described above.

### FOURTH CAUSE OF ACTION
ASSAULT & BATTERY

98.     The above paragraphs are here incorporated by reference.

99.     By seizing, approaching, intimidating, questioning, and forcibly grabbing and handcuffing Plaintiffs, Defendants made Plaintiffs fear for their physical well-being and safety and placed them in apprehension of immediate harmful and offensive touching.

100.    Defendants engaged in and subjected Plaintiffs to immediate harmful and offensive touching and battered them without their consent.

101.    Defendants, their officers, agents, servants and employees, were responsible for Plaintiffs' arrest, detention, and imprisonment during this period of time.

102.  As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiffs sustained the damages described above.

## FIFTH CAUSE OF ACTION
TRESPASS

103.  The above paragraphs are here incorporated by reference.

104.  On the date of this incident, Plaintiffs resided at 94-52 221st Street, Queens Village, NY.  Defendants voluntarily and intentionally entered the home of Plaintiffs without Plaintiffs' consent.

105.  As a result of this illegal trespass without a warrant, Plaintiffs were damaged.

## SIXTH CAUSE OF ACTION
NEGLIGENT HIRING AND RETENTION

106.  The above paragraphs are here incorporated by reference.

107.  Defendants owed a duty of care to Plaintiffs.

108.  Defendant City, through the NYPD, breached its duty of care to Plaintiffs because under the same or similar circumstances a reasonable, prudent and careful person should have known Plaintiffs had committed no crime and should have anticipated an injury to Plaintiffs or those in a position similar to Plaintiffs as a result of this conduct.

109.  Defendant officers were incompetent and unfit for their positions.

110.  Defendant City knew or should have known through exercise of reasonable diligence that the officer defendants were potentially dangerous and had previously falsely arrested civilians without probable cause, used excessive force on civilians, and fabricated evidence against civilians.

111.  Defendant City's negligence in hiring and retaining the officer defendants proximately caused Plaintiffs' injuries.

112.  Because of the defendant City's negligent hiring and retention of defendant officers, Plaintiffs incurred damages described above.

### SEVENTH CAUSE OF ACTION
RESPONDEAT SUPERIOR

113.  The above paragraphs are here incorporated by reference.

114.  Defendants' tortious acts were undertaken within the scope of their employment by defendant City of New York and in furtherance of the defendant City of New York's interest.

115.  As a result of Defendants' tortious conduct in the course of their employment and in furtherance of the business of defendant City of New York, Plaintiffs were damaged.


WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

A.      In favor of Plaintiffs in an amount to be determined by a jury for each of Plaintiffs' causes of action;

B.      Awarding Plaintiffs punitive damages in an amount to be determined by a jury;

C.      Awarding Plaintiffs reasonable attorneys' fees, costs and disbursements of this action; and

D.      Granting such other and further relief as this Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:      June 17, 2016
            Brooklyn, New York

                                        Respectfully submitted,


                                        STOLL, GLICKMAN & BELLINA, LLP

                                        _____
TO:    City of New York                 By: Amy Robinson, Esq.
       Office of Corporation Counsel     475 Atlantic Ave., 3rd Floor
       100 Church Street                 Brooklyn, NY  11217
       New York, NY  10007               (718) 852-3710
                                         arobinson@stollglickman.com
       Det. Fernando Sanchez             *Attorney for Plaintiffs*
       Narcotics Borough Queens
       1404 111 Street, 2nd Floor
       College Point, NY 11354

       Sgt. Adan Muñoz
       Narcotics Borough Queens
       1404 111 Street, 2nd Floor
       College Point, NY 11354

       Undercover Officer #CO 121
       Chief of Detectives Office
       1 Police Plaza, 13th floor
       New York, NY 10038